actual cost of repairing the trailer was $253.18, and proof was made accordingly.

For the reasons assigned the judgment appealed from is annulled and set aside and it is now ordered, adjudged, and decreed that there be judgment rejecting the claims of the plaintiff, Joseph Capone, against the Cotton Trade Warehouses, Inc., and The Employers' Liability Assurance Corporation, Ltd., and it is further ordered that there be judgment in reconvention in favor of the Cotton Trade Warehouses, Inc., and against the plaintiff, Joseph Capone, for the sum of $253.18, with legal interest from judicial demand; the plaintiff to pay all costs of this proceeding.

O'NIELL, C. J., dissents, being of the opinion that the judgment appealed from is correct and should be affirmed.

41 So.2d 509

ORLEANS PARISH SCHOOL BOARD v. LOUISIANA STATE BOARD OF EDUCATION et al.

No. 39331.

May 9, 1949.

Rehearing Denied May 31, 1949.

Bolivar E. Kemp, Jr., Atty. Gen., Carroll Buck, First Asst. Atty. Gen., C. Ellis Ott, Special Counsel, Bogalusa, for defendants-appellants.

Henry B. Curtis, Grady C. Durham, New Orleans, for plaintiff-appellee.

HAMITER, Justice.

The dispute in this injunction proceeding concerns the disbursement of an appropriation made by the Legislature of 1948 in the General Appropriation Act, Act No. 350, section 4, Schedule 110, Item 8, to carry into effect the minimum salary schedule for public elementary and high school teachers of which Act No. 155 of 1948 directs the establishment and maintenance.

The Orleans Parish School Board instituted the suit and cited as defendants the State Board of Education, the State Superintendent of Education and the State Treasurer. In the petition plaintiff alleged:

"I. That, by virtue of Act No. 155 of the Regular Session of the Louisiana Legislature for 1948, the Louisiana State Board of Education was authorized and directed to establish and maintain a minimum salary schedule to be paid public elementary and high school teachers in the schools in the State of Louisiana and that by virtue of Item 8, Schedule 110 of Act 350, being the

General Appropriation Act of the Regular Session of the Louisiana Legislature for. 1948, there was appropriated to be distributed and apportioned by the Treasurer, out of the State Public School Fund, to the Teachers Salary Fund created by said Act No. 155, to be withdrawn from the treasury and distributed by the Louisiana State Board of Education to the various Parish and State School Boards to carry into effect said minimum salary schedule the sum of Eight Million Dollars ($8,000,000.00) for the fiscal year 1948-49, and the sum of Eleven Million Three Hundred Thousand Dollars ($11,300,000.00) for the fiscal year 1949-50.

"II. That pursuant to said Act No. 155 of 1948, the State Board of Education and the members thereof, and/or the State Superintendent of Education, the Hon. Shelby M. Jackson, have devised a formula or a plan, or are about to devise and adopt a formula or plan for the apportionment and distribution of the appropriation made in the State General Appropriation Act of 1948, for the purpose of carrying into effect said minimum salary schedule authorized by Act No. 155 of 1948.

"III. That if defendants, the said State Board of Education and the members thereof, and/or the State Superintendent of Education, the Hon. Shelby M. Jackson, or if the State Treasurer, the Hon. A. P. Tugwell, distribute the said funds pursuant to any other plan or formula than that au-

thorized by Article 12 of the Constitution of the State of Louisiana, they will be in contravention of that section of the Constitution, and said funds will be distributed in an illegal and unconstitutional manner.

"IV. Petitioners further aver that, if defendants distribute the State Funds in compliance with Article 12 of the Constitution of the State of Louisiana, there will be paid to the Orleans Parish School Board approximately One Million Dollars ($1,000,000.00), whereas if the distribution of said State Funds is made in accordance with the said proposed plan or formula, the amount which the Orleans Parish School Board will receive will be less than Two Hundred Thousand Dollars ($200,000.00); that petitioners have advised the members of the Louisiana State Board of Education and the Superintendent of Education, Honorable Shelby M. Jackson, and also Honorable A. P. Tugwell, State Treasurer, all of said officials having their legal domicile in the Parish of East Baton Rouge, that petitioners believe and contend that such proposed action is unconstitutional, null and void for the reasons above stated, and particularly because it is in contravention of Article 12 of the Constitution of 1921, and that if Act No. 155 of 1948 provides for any other method of distribution than that set forth in the constitution it is unconstitutional for the reasons stated.

"V. That despite petitioners' protest, they are advised and believe and so aver

that the State Board of Education and the State Superintendent of Education will undertake to withdraw from the State Treasury the funds appropriated for the support of the public schools and will proceed to distribute said funds under the purported authority of Act No. 155 of 1948 and in violation of the constitutional provision hereinabove referred to.

"VI. That petitioners will thereby suffer irreparable injury in that they will be deprived of approximately Eight Hundred Thousand Dollars ($800,000.00), of the State Funds appropriated for the support of public schools, and that they have no adequate remedy at law.

"VII. That petitioners are entitled to a temporary restraining order enjoining and prohibiting the State Board of Education, the State Superintendent of Education and the Hon. A. P. Tugwell, State Treasurer, from withdrawing or permitting the withdrawal from the State Treasury of the funds appropriated by the Louisiana Legislature for 1948 for the support of public schools, or from distributing or disbursing any of said funds except in accordance with the Constitution, and particularly enjoining the defendants from complying with Act No. 155 of 1948; that defendants should be ordered to show cause why a preliminary injunction should not be issued, and, after due proceedings, why said injunction should not be made permanent."

In keeping with its allegations plaintiff prayed for appropriate injunctive relief.

On the filing of the petition the court directed the issuance of a temporary restraining order and also a rule to show cause why a preliminary writ of injunction should not issue.

When the rule came on for a hearing defendants tendered exceptions of no right and no cause of action. These were argued by counsel, and the court reserved its ruling thereon. Then evidence in connection with the rule was received (introduced only by plaintiff's counsel in support of the allegation that a plan was being devised to carry into effect the minimum salary schedule), although defendants filed no formal answer, and the hearing was concluded.

Some two weeks later the court overruled the exceptions of no right and no cause of action and ordered the issuance of a preliminary writ of injunction. Following that ruling counsel agreed to submit the application for a permanent injunction on the evidence received during the hearing of the rule nisi. Thereupon, the court, on February 10, 1949, signed a formal judgment, the decretal portion of which states: "It is ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, Orleans Parish School Board, and against the defendants, the Louisiana State Board of Education, Shelby M. Jackson, Superintendent of Education, and A. P.

Tugwell, Treasurer of the State of Louisiana, overruling the exceptions of no right or cause of action filed by the defendants and permanently enjoining the said defendants from withdrawing, distributing, or disbursing any of the funds appropriated in Item 8, Schedule 110, of Act 350 of 1948, for the purpose of carrying out the provisions of Act 155 of 1948, except as provided by paragraph 5, Section 14, Article 12 of the Constitution, as amended by Act 2 of the Extra Session of 1947, which is to say that the distribution of said appropriation shall be made by the State Board of Education on the basis of three-fourths to the several parish school boards, paid in monthly installments in the proportion that the number of educable children from six to eighteen years of age, inclusive, from each parish bears to the total number of such educable children in the state, and one-fourth to be apportioned and distributed on the basis of equalization, so as to provide and insure a minimum educational program in the common public schools, which shall be set up by the State Board of Education for all the parishes in the state, the administration and regulation of this apportionment, distribution, and payment of this fund to be under plans, rules, and regulations to be provided by the State Board of Education."

Immediately thereafter counsel further agreed that the exceptions of no right and no cause of action filed to the rule nisi should be deemed as having application to

both the preliminary and permanent injunctions; that the return date respecting an appeal (the statutory delays were waived) be fixed as February 14, 1949; and that the transcript of appeal should consist of the original records. Then counsel for defendants moved for and obtained a devolutive appeal, without bond, returnable in accordance with the mentioned agreement.

On the return date of February 14, 1949, the transcript of appeal, containing the original pleadings and offerings, was lodged in this court. It was not placed upon our calendar for consideration, however, until April 12, 1949, at which time counsel filed a joint motion, pursuant to Rule IX, Section 8 of the Supreme Court Rules, stating that "they desire to submit this cause for decision, without oral argument, upon their briefs which accompany this motion."

By Act No. 155 of 1948, in Section 1, the Legislature authorized and directed the Louisiana State Board of Education "to establish and maintain a minimum salary schedule to be paid public elementary and high school teachers in the schools of the State of Louisiana by including the schedule hereinafter set out in the formula for computing the state equalization fund distribution."

Section 3 thereof provides:

"Beginning with the session 1948-49 and continuing thereafter all public elementary and high school teachers in the schools of

the State of Louisiana shall receive a minimum salary on a nine-month basis in accordance with the schedule hereinafter given as follows:

effect. The amounts hereby appropriated shall form no part of the State Public School Fund. Provided, that if the appropriations for the purposes of this act made

Proposed Minimum Salary Schedule For Teachers

| | A (Below 1 yr.) | B 1 year | C 2 years | D 3 years | E B. A. or B. S. | F Master's |
|---|---|---|---|---|---|---|
| 1st | $1,200 | $1,500 | $1,800 | $2,100 | $2,400 | $2,500 |
| 2nd | | ...... | 1,900 | 2,200 | 2,500 | 2,600 |
| 3rd | | ...... | 2,000 | 2,300 | 2,600 | 2,700 |
| 4th | | ...... | 2,100 | 2,400 | 2,700 | 2,800 |
| 5th | | ...... | ...... | 2,500 | 2,800 | 2,900 |
| 6th | | ...... | ...... | ...... | 2,900 | 3,000 |
| 7th | | ...... | ...... | ...... | 3,000 | 3,100 |
| 8th | | ...... | ...... | ...... | 3,100 | 3,200 |
| 9th | | ...... | ...... | ...... | 3,200 | 3,300 |
| 10th | | ...... | ...... | ...... | ...... | 3,400 |
| 11th | | ...... | ...... | ...... | ...... | 3,500 |
| 12th | | ...... | ...... | ...... | ...... | 3,600 |

"No teacher will receive less than the salary received during 1947–48 for nine-month's work."

And Section 5 of such statute reads:

"There is hereby appropriated, out of the State General Fund, to a special fund in the Treasury, to be known as the Teachers Salary Fund, the sums of $8,000,000.00 for the fiscal year 1948–1949 and $11,300,000.-00 for the fiscal year 1949–1950, or as much of said sums as is necessary, to be withdrawn from the Treasury and distributed by the Louisiana State Board of Education to the various parish and city school boards to carry this minimum salary schedule into

by the Legislature, together with funds provided from any other source, are insufficient to fully comply with this act and to pay the minimum salaries herein provided for, such minimum salaries shall be reduced proportionately to come within the funds appropriated or made available for the purpose of this act."

Immediately beneath this fifth section Governor Long wrote:

"I hereby veto the items of appropriation contained in Section 5, for the reasons stated below.

"(sgd) Earl K. Long
"Governor"

The reasons assigned for the veto, which appear after Section 6 (the repealing clause), are:

"Approved: June 25, 1948. Except that I have vetoed the items of appropriation contained in Section 5 of this act, as the items of $8,000,000.00 for fiscal year 1948–1949 and $11,300,000.00 for fiscal year 1949–1950 are contained in the General Appropriation Bill—H. B. 777."

▮ The veto, as the notation of it clearly states, affected only the appropriation. It did not nullify the remaining provisions of the section, including that which designated a special fund in the treasury to be known as the Teachers Salary Fund.

In lieu of the vetoed appropriation there was placed in the General Appropriation Act of 1948, the referred to H. B. 777 which became Act No. 350, under section 4, Schedule 110, styled Department of Education, the following:

"Item 1948–1949 1949–1950
 * * * * * *

"8. There is hereby appropriated, and there shall be distributed and apportioned by the Treasurer, out of the State Public School Fund, to the Teachers' Salary Fund created by House Bill No. 178, to be withdrawn from the treasury and distributed by the Louisiana State Board of Education to the various parish and city school boards to carry into effect the minimum salary schedule as provided in said House Bill No. 178, a sufficient amount, estimated at....8,000,000.00 11,300,000.00

 * * * * * *

"Provided, that should insufficient funds accrue to the State Public School Fund to make the apportionment and distribution herein provided for, the amount of the deficit is hereby appropriated out of any money in the General Fund not otherwise appropriated."

In view of all of which it can be said with certainty that the Legislature and the Governor clearly displayed an intention to provide the listed sums for carrying into effect the minimum salary schedule, irrespective of whether payment was to be made from the State Public School Fund or the General Fund or from both.

In their brief, following an extract of the first paragraph of the quoted Item 8, plaintiff's counsel state: "The question squarely presented is, can the Legislature disregard the formula for distribution of the State Public School Fund as specified in paragraph 5, Section 14 of Article XII of the Constitution, as amended by Act No. 2 of the Extra Session of 1947?"

Section 14 of Article XII of the Louisiana Constitution of 1921, as last amended by the adoption in April, 1947, of Act 2 of the Extra Session of 1947, reads in full as follows:

"State funds for the support of the public common schools of elementary and sec-

ondary grades shall be derived from the following sources and shall be apportioned to the parish school boards in the manner herein provided:

"First: A two and one-half mill ad valorem state-wide tax upon each dollar of the assessed valuation, for state purposes, of all property subject to state taxation; provided, that out of the said taxes, fifty thousand ($50,000.00) dollars shall be paid annually to the Isaac Delgado Trade School, located in the City of New Orleans.

"Second: The residue of the Severance Tax Fund of the State, after allowing funds and appropriations as provided for elsewhere by this Constitution, and providing that not more than Five Hundred Thousand ($500,000.00) Dollars per annum may be appropriated by the Legislature for the cost of administering and inspecting and enforcing of the taxes accruing to the Severance Tax Fund, and for the administration of the conservation laws incident to the severance of natural resources from the soil and water of the State, which severance tax fund shall be devoted, after allowing such funds and appropriations, as fixed in this Constitution, first, to supplying free school books, second, to supplying free school supplies such as library books, pencil and ink, writing paper, pencils, pens, ink, and the like, to the school children of the State. After July 1st of each year, the State Treasurer shall forthwith set up a fund for the payment of the fixed charges hereinabove mentioned. When sufficient funds have accumulated for the payment of all such school books and supplies and other fixed charges, then, before the tenth day of each month, the State Treasurer shall transfer to the State Public School Fund such balances as have accrued. This section shall be self-operative and all State officers affected hereby are required to carry out the provisions of this Section without further legislative action.

"Third: The proceeds of particular taxes, now or hereafter, levied by the Legislature and dedicated, allocated, destined to or designated for said State Public School Fund.

"Fourth: The proceeds and all net avails of a tax of one-half of one cent (½c) per gallon levied upon the retail sale of gasoline, benzine, naptha or other motor fuel, as defined in the present Section 22 of Article 6 of the Constitution of 1921.

"Fifth: Such other funds as the Legislature has or hereafter may designate, allocate, appropriate, or otherwise provide therefor or destine thereto; provided, that the Legislature must and shall provide, by appropriate tax levies, appropriation or otherwise, a minimum amount in this State Public School Fund of not less than Ten Million Dollars ($10,000,000.00) per annum. The State Auditor and the State Treasurer shall transfer all balances on

hand for public common schools to the State Public School Fund herein provided for, promptly after these amendments and laws shall have gone into effect.

"All State funds for the support of public schools as herein, heretofore, or hereafter provided for, shall be segregated and kept in separate bank accounts, apart from all other State funds. Such funds as may be appropriated out of the general fund shall be paid into the State Public School Fund herein provided for, in twelve equal monthly payments, and all such funds, including any appropriation from the general fund, shall be apportioned and distributed to the parishes and paid out to the parish school boards on the following basis:

"(a) Three-fourths (¾) of this State fund shall be apportioned and distributed to the several parish school boards in this State and shall be paid in monthly installments, in the proportion that the number of educable children from six (6) to eighteen (18) years of age, inclusive, in each parish, bears to the total number of such educable children in the State; and the Legislature shall provide for the enumeration of said educable children.

"(b) One-fourth (¼) of this State fund shall be apportioned and distributed to the parish school boards on the basis of equalization, so as to provide and insure a minimum educational program in the common public schools, which shall be set up by the State Board of Education for all parishes of the State; provided, that the administration and regulation of this apportionment, distribution and payment of this fund to the respective parish school boards, shall be under plans, rules and regulations to be made and provided by the State Board of Education, and shall be under the jurisdiction and supervision of said Board.

"(c) Any other State funds provided by law for the support of public schools shall be apportioned and distributed in like manner, after payment thereof in accordance with the Act appropriating the same.

"In addition to the State funds for the support of the public common schools, as above provided for, the following funds are recognized to be therefor and shall be distributed and paid out to the several parishes, under the authority and jurisdiction of the State Board of Education, and in accordance with the terms of the law governing such funds or the valid stipulations of the source thereof, to-wit:

"1. The interest on the proceeds of lands heretofore or hereafter granted by the United States for school purposes and such revenues as may be derived from unsold portions of such lands.

"2. All funds and the proceeds of lands and property, other than unimproved lands, heretofore or hereafter bequeathed, granted or escheated to the State, not designated for any other purpose.

"3. Appropriations or grants made for Vocational Education or any other phase

of education by the United States Office of Education or any other agency of the federal government.

"4. Sums received from philanthropic agencies.

"5. All such other educational funds as the Legislature may provide or as may be otherwise received for educational purposes.

"Any appropriation made by House Bill No. 3 of this Session for the increase of salaries of teachers and of the compensation of other employees of the parish school boards made at the current special session of the Legislature for the fiscal year 1946–1947 and 1947–1948 is hereby ratified, shall not be reduced or repealed by the Legislature, shall upon the adoption of this amendment be retroactive to the beginning of the 1946–1947 and 1947–1948 respectively session of the public schools and any portion thereof then due shall be paid and disbursed."

A reading of the provisions of this section as presently constituted, without taking into consideration the history of their development or the legal principles relating to the Legislature's control over state finances, furnishes the impression that an appropriation from the State Public School Fund can legally be made only if and when the money is apportioned and distributed to the parishes and paid out to the parish school boards in accordance with the prescribed formula of ¾ths on a per educable basis and ¼th on the basis of equaliza-

tion. If such be the correct interpretation of those provisions the appropriation by the 1948 Legislature from the State Public School Fund to carry into effect the minimum Teachers Salary Schedule provided in Act No. 155 of 1948 (unless apportioned and distributed on the ¾th—¼th basis) is, of course, unconstitutional and illegal. Likewise stricken with nullity are those other appropriations of 1948, as well as many made during preceding years, for such items as teachers' retirement, education for crippled children, vocational rehabilitation, and salary and expenses of State Superintendent of Education, because the appropriation for each of those has been from the State Public School Fund without apportionment and distribution to the parish school boards on a per educable and equalization basis.

 The provisions of the present Section 14 of Article XII of our Constitution, however, are not free of ambiguity; and, when considered in the light of the history of their development, they can reasonably be construed as requiring the Legislature only to maintain in the State Public School Fund, to be apportioned and distributed therefrom under the prescribed formula, an annual sum of at least $10,-000,000.00. Any excess in such fund, it logically follows under that construction, may be similarly apportioned, or it may be otherwise distributed for the support of public schools in such manner as the Legislature deems advisable, because, subject

.only to constitutional restrictions, that body's power over state funds is plenary.

As originally written into the Constitution of 1921, Section 14 of Article XII provided:

"The public school funds of the State shall consist of:

"First, The proceeds of two and one-half mills of the taxes levied and collected by the State; provided, that out of the portion of said taxes collected in the city .of New Orleans fifty thousand dollars ($50,000.00) shall be paid annually to the Isaac Delgado Trade School.

"Second, The proceeds of the poll tax which shall be applied exclusively to the support of public schools in each parish in which collected and shall be paid by the tax collector directly to the parish school board.

"Third, The interest on the proceeds of lands heretofore or hereafter granted by the United States for school purposes, and the revenues derived from unsold portions thereof.

"Fourth, All funds and the proceeds of lands and property, other than unimproved lands, heretofore or hereafter bequeathed, granted, or escheated to the State, not designated for any other purpose.

"Fifth, Such other funds as the Legislature may. appropriate.

"All school funds, except the poll tax ·and the interest on proceeds of lands grant-ed by the United States for the support of public schools, shall be distributed to each parish in proportion to the number of children therein between the ages of six and eighteen years. The Legislature shall provide for the enumeration of educable children."

Under these provisions all school funds, other than those specifically excepted, had to be apportioned on a per educable basis. Therein certain proceeds were definitely allocated for school purposes; but the Legislature was not charged with the duty of augmenting them so as to create and maintain a minimum school fund.

In 1930, on the ratification of Act No. 6 of the Extra Session of the Legislature of that year, the establishment and maintenance of a minimum school fund of $12 per educable was required, it to be realized from the following sources:

(a) A two and one-half mill tax on the state assessment;

(b) The residue of the severance tax fund after supplying school books;

(c) Appropriations by the Legislature sufficient in amount to bring the total of state school funds to said minimum of $12 per educable.

Of that $12 minimum the State Board of Education was authorized to apply as much as $2 per educable towards equalizing public school facilities in all of the parishes of the state. Further, the Legislature was given authority (but not required) "to

make appropriations for the support of the public schools in excess of twelve ($12.00) dollars per educable." Finally, the amendment of 1930, as did the original draft, provided that all school funds (except the equalizing fund and others mentioned) should be distributed on a per educable basis. But this directed distribution very well could have been intended to apply to school funds only to the extent of the established and required minimum. If not so intended what was there to prevent the Legislature itself from restricting the distribution to the minimum? It could have refused to make appropriations sufficient in amount to provide an excess. It is significant, in this connection, that the amendment merely authorized (it did not direct) the Legislature to make appropriations for the support of the public schools in excess of the minimum.

The next amendment approved was that proposed by Act No. 76 of 1934. Except as hereafter pointed out, it placed Section 14 of Article XII of the Constitution (insofar as pertinent here) in substantially the present form, fully set out above. But it (especially the fifth paragraph thereof) made numerous material and drastic changes in the previously existing provisions. Its paragraph one again provided for the two and one-half mill state-wide ad valorem tax for school purposes. The second paragraph stated that the residue of the severance tax fund, accumulated after the payment of school books for the children of the state and other fixed charges, should

be transferred to the State Public School Fund (this fund, as such, was thereby created). The third and fourth paragraphs provided respectively that school funds should be derived from the proceeds "of particular taxes, now or hereafter, levied by the Legislature and dedicated, allocated, destined to or designated for said State Public School Fund," and from the net avails of a one-half cent per gallon levied on motor fuel.

The fifth paragraph of the 1934 amendment (that which furnished the most important changes) recited that support of public common schools should also come from such other funds as the Legislature has or hereafter may designate, allocate, appropriate or otherwise provide therefor; *"provided, that the Legislature must and shall provide, by appropriate tax levies, appropriation or otherwise, a minimum amount in this State Public School Fund of not less than Ten Million Dollars ($10,000,000.00) per annum."* (Italics ours.)

Further, the fifth paragraph of the 1934 amendment wrote into the Constitution for the first time the discussed ¾th—¼th formula. As to the distribution under this formula, however, it stated:

" * * * Provided, that the fractional apportionments hereinabove required shall not become effective until such time as funds expected annually from tax levies, Legislative appropriations, or other sources, shall amount to the sum of ten million ($10,000,000.00) dollars; until and unless

such amount is reached, said fractional apportionments shall be no more than five-sixths (⅚), on the basis of educables, and no more than one-sixth (⅙), on the basis of equalization.

*"Provided, that in no case shall the state support for any parish exceed ninety (90%) per centum of the cost of the minimum state educational program in that parish."* (Italics ours.)

In conclusion, the fifth paragraph recognized other and additional funds as being for the support of the public common schools, but distributable under the authority and jurisdiction of the State Board of Education in accordance with the terms of the law governing such funds or the valid stipulations of the source thereof.

Considered in its entirety the 1934 amendment seemingly indicated a purpose on the part of its framers primarily to create and maintain a definite fund in the treasury, dedicated to the support of public common schools and distributable on the ¾th—¼th basis, sufficient to defray no more than 90% of the cost of the minimum state educational program in every parish of the state, for the carrying out of which plan the sum of $10,000,000.00 was estimated as being necessary. In keeping with that apparent purpose the Legislature was directed to build up the State Public School Fund to the estimated amount and thereafter to so maintain it, employing therefor the proceeds from the constitutionally dedicated taxes and additionally

(to care for any deficiency up to the minimum) such other funds (from tax levies, appropriations or otherwise) as it thought best. Until the sum of $10,000,000.00 was reached in that fund, the apportionment would continue to be (as under the 1930 amendment) not more than ⅝ths on the basis of educables and ⅛th on an equalizing basis. But the Legislature was not required by the 1934 amendment to maintain a surplus (in excess of $10,000,000.00) in the State Public School Fund to be apportioned on the ¾th—¼th basis; hence, it could regulate its appropriations and the proceeds of tax levies (assuming that the constitutionally dedicated taxes did not provide the necessary sum) so as to restrict that fund to the directed minimum. Moreover, if 90% of the cost of the state educational program did not equal the $10,000,000.00 minimum Public School Fund, the entire minimum could not have been disbursed, even though sought to be distributed in accordance with the formula.

The present Section 14 of Article XII of the Constitution, it is true, does not contain the 90% maximum disbursement provision of the 1934 amendment, it having been deleted in 1947. The reason for the deletion, obviously, was to afford the Legislature the right to disburse a surplus, which had accumulated in the State Public School Fund, without regard to the cost of the minimum state educational program. The deletion, however, did not militate against the discussed primary purpose seemingly

indicated by the provisions of the 1934 amendment.

Neither is a contrary purpose disclosed by the concluding provisions of the 1947 amendment, which ratified specific appropriations for the increase of compensation for teachers and other school personnel, or by the rejected proposed amendment of 1948, Senate Bill No. 29, Act No. 512 of 1948, which sought to authorize the Legislature to make certain appropriations from the State Public School Fund. These, undoubtedly, were in the nature of precautionary measures taken by reason of the ambiguity attending the constitutional provisions under consideration.

■■ The ambiguous provisions of Section 14, Article XII of the Louisiana Constitution with reference to disbursements from the State Public School Fund, it is thus seen, are reasonably susceptible of two different interpretations, namely, (1) the entirety of that fund, irrespective of the amount therein, must be apportioned and distributed to the parishes and paid out to the parish school boards on the basis of ¾ths per educable and ¼th for equalization; or (2) the Legislature is required to disburse in accordance with the prescribed ¾th—¼th formula only $10,000,000.00 per annum, and it may pay out and distribute for public school purposes, but solely for those purposes, any excess of that sum in such manner as it deems advisable. Of these two possible interpretations the latter seems preferable, and, in our opinion, it should and must be adopted. Of course, a few of the parishes under that interpretation may not obtain as much of the state educational funds as they would if the ¾th—¼th formula were applied to all money entering and disbursed from the State Public School Fund; yet no parish will be denied the minimum state educational program, the providing of which Article XII, Section 14 of the Constitution primarily purposes to insure, as its historical development indicates. It is well to observe, in this connection, that the Legislature of 1948 approved an apportionment and distribution on the ¾th—¼th basis of much more than the guaranteed $10,000,000.00, the appropriation, Schedule 110, Act No. 350, under that formula being:

| "Item | 1948–1949 | 1949–1950 |
|---|---|---|
| * * * * | * * * * | |
| "Support of Free Public Schools | | |
| "Out of Public School Fund: | | |
| "6. For distribution to parishes on basis of per educable (estimated) | $27,777,796.00 | $27,777,796.00 |
| "7. For distribution on equalization basis (estimated) | 9,259,265.00 | 9,259,265.00" |

Then, too, under the latter interpretation, the assailed appropriation from the State Public School Fund to the Teachers Salary Fund, to carry into effect the minimum salary schedule provided by Act No. 155 of 1948, would be legal, constitutional and payable as intended. This result would accord with the manifest intention of the Leg-

islature and of the Governor to effectuate the minimum salary schedule for teachers, and it would be consistent with the well established principle of law that legislative acts are entitled to great respect and are presumed to be constitutional.

The adoption of the former interpretation, on the other hand, would not only prevent payment from the Teachers Salary Fund as intended, but is would also render vulnerable, with assured success attending the probable attacks, the following items of the mentioned 1948 General Appropriation Act, to-wit:

"Department of Education

| "Item | 1948–1949 | 1949–1950 |
|---|---|---|
| "Out of the State Public School Fund: | | |
| "1. Salary of State Superintendent of Education | $ 7,500.00 | $ 7,500.00 |
| "1a. Additional salary of Superintendent of Education in the event of final passage of House Bill No. 658 .......... | 2,500.00 | 2,500.00 |
| "2. For other salaries, fees, dues, postage, and transportation charges, printing, rents, services, aid to local government agencies, travel, office, and other expenses and supplies .................. | 306,531.00 | 312,197.00 |

\* \* \* \* \* \* \* \* \*

"Vocational Rehabilitation

"Payable from State Public School Fund:

| "3. For Vocational Rehabilitation ............ | $ 207,181.00 | $ 207,181.00 |
|---|---|---|

\* \* \* \* \* \* \* \* \*

| "Contribution to Teacher's Retirement System | | |
|---|---|---|
| "Out of State Public School Fund: | | |
| "11. To reimbuse Parish School Boards for employers' contribution to State Teachers' Retirement System and Teachers' Retirement System of Orleans Parish (estimated).... | $3,400,000.00 | $3,400,000.00 |

\* \* \* \* \* \* \* \* \*

| "Teachers' Retirement System | | |
|---|---|---|
| "Out of State Public School Fund: | | |
| "1. For the expense of the Administration of the Teachers' Retirement System; as provided in Act 83 of 1936....... | $ 31,500.00 | $ 31,500.00 |
| "2. To provide assistance to aged and disabled teachers not otherwise eligible under the Retirement Law; as provided in Act 108 of 1942 and Act 228 of 1944.... | 108,000.00 | 108,000.00 |
| "2a. Additional funds required in the event of final passage of House Bill No. 177 [Now Act No. 68] (Brackets ours.) ................. | 279,000.00 | 279,000.00" |

And there would likely result, should the former interpretation be adopted, immeasurable confusion, if not serious disorder, in the public educational system of Louisiana. Surely such a result is undesirable.

For the reasons assigned the judgment appealed from is reversed and set aside, and

it is now ordered that the injunction granted herein be dissolved and plaintiff's suit dismissed.

McCALEB, J., dissents with written reasons.

O'NIELL, C. J., takes no part.

McCALEB, Justice, (dissenting).

The question presented by this appeal is whether the Legislature may validly appropriate, out of the State Public School Fund, monies to a teachers' salary fund created by Act No. 155 of 1948, and authorize the State Board of Education to distribute those monies in a manner other than that provided by Section 14 of Article XII of the Constitution, as amended by Act No. 2 of the Extra Session of 1947, which declares:

"All State funds for the support of public schools as herein, heretofore, or hereafter provided for, shall be segregated and kept in separate bank accounts, apart from all other State funds. Such funds as may be appropriated out of the general fund shall be paid into the State Public School Fund herein provided for, in twelve equal monthly payments, *and all such funds, including any appropriation from the general fund, shall be apportioned and distributed to the parishes and paid out to the parish school boards on the following basis:*

"(a) Three-fourths (¾) of this State fund shall be apportioned and distributed to the several parish school boards in this State and shall be paid in monthly installments, in the proportion that the number of educable children * * *.

"(b) One-fourth (¼) of this State fund shall be apportioned and distributed to the parish school boards on the basis of equalization, so as to provide and insure a minimum educational program in the common public schools, * * * *". (Italics mine).

The majority hold that Section 14 of Article XII, as amended, is ambiguous and equivocal. Based on this premise, the Court proceeds to interpret the fifth paragraph of the section in such a fashion as to transpose its plain language and substitute therefor a new concept which may produce unheralded results. For my part, I find no room for judicial interpretation or construction as the language in the Section is perfectly clear and expresses, beyond peradventure, the intention of the people that all monies dedicated, appropriated or otherwise paid into the State Public School Fund must not only be segregated and kept apart from all other State funds but also that they cannot be paid out or distributed to anyone other than the various parish school boards and upon any other basis than the ¾—¼ apportionment set forth in subparagraphs (a) and (b) of the fifth paragraph.[1]

---

[1] It is a cardinal rule of statutory construction that "When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit." Article 13 of the Civil Code.

The majority concede the literal clarity of Section 14 of Article XII—for, after quoting the section in full, the opinion states that "A reading of the provisions of this section as presently constituted, without taking into consideration the history of their development or the legal principles relating to the Legislature's control over state finances, furnishes the impression that an appropriation from the State Public School Fund can legally be made only" by distributing the money to the Parish school boards in accordance with the ¾—¼ formula set forth therein. But, by assuming the obscurity of the provisions "when considered in the light of the history of their development" and employing this as a base for pursuing an investigation of their spirit, the opinion goes on to declare that it never was intended that the public school fund was to be rendered immutable from legislative control, disposal and appropriation insofar as concerns the excess of the $10,000,000 minimum which the Legislature is required to furnish by tax appropriation and otherwise under the first subparagraph of the fifth paragraph of the Section. In this construction, the Court has judicially changed the minimum $10,000,000 requirement to a maximum fund in respect to legislative control over the public school fund and, perhaps, with dire future effects—for, now that the legislative restraint is lifted, that department of government can allocate all school funds in excess of $10,000,000 to any purpose which it desires without any

basis of equality so long as it is tagged for public school support.

As shown by items six and seven of Schedule 110 of the General Appropriation Act, No. 350 of 1948, the amounts allocated for distribution to parishes out of the State Public School Fund, in accordance with the provisions of the Constitution, are for the years 1948–1949, 1949–1950, $27,777,796 on the ¾ per educable basis and $9,259,265 on the ¼ equalization basis, or a total of $37,037,061 for each school year. Under the ruling of the majority, no more than $10,000,000 of this total amount was required to be allocated in conformity with the educable and equalization formula and the Legislature could have appropriated the huge balance of $27,037,061 to the State Board of Education for distribution or it could have disposed of it by numerous and sundry school appropriations in the manner which it deemed best.

Even if the constitutional provision be viewed as ambiguous, any reasonable interpretation of the language used therein, with due consideration being given to the history of the provision, would not, in my opinion, warrant the conclusion of the majority. In discussing this feature of the case, the opinion harks back to the original provisions of Section 14 of Article XII as written in 1921, which merely designate the proceeds of various taxes for the public schools. No drastic changes were made in the Section until 1934, when the people voted to amend it in accordance with Act

No. 76 thereof. That amendment sets forth, for the first time, the policy of the people respecting the funds for the support of the public schools and their express will to dedicate and earmark those funds for allocation among the various parish school boards on the ¾—¼ basis. The opening sentence of the section, which is unchanged in its present form, reads: "State funds for the support of the public common schools of elementary and secondary grades shall be derived from the following sources and shall be apportioned to the parish schoolboards in the manner herein provided: * * *."

Thus, there can be no doubt as to the intention of the people to create a fund for the support of the public schools, provide the source of the fund and the manner of its apportionment. The first, second, third and fourth paragraphs of the Section refer exclusively to the source of the fund and the all important fifth paragraph provides for the allocation of all monies in the fund on the ¾—¼ formula in exactly the same language as contained in the Section as presently amended—except that it is provided that, in the event the annual $10,000,000 required in the fund is not received, then the apportionment shall be on a ⅚—⅙ instead of the ¾—¼ basis. In addition, there is another exception which has been deleted from the Section in its present form—that is, that the State's support for schools for any Parish shall not exceed 90% of the cost of the minimum State educational program in that Parish.

The constitutional provision, as first incorporated by the amendment in 1934, has continued without change up to the present time—except in the particulars above pointed out and also certain changes in 1936 and 1940, which are unimportant here. The majority think that the elimination, in 1947, of those provisions, relative to the change in fractional apportionment in case the tax collections are insufficient to provide the $10,000,000 minimum and the proviso that the State support shall not exceed 90% of the Parish cost, supplies a foundation for the holding that the $10,000,000 minimum appropriation for the fund is really a maximum requirement insofar as legislative control is concerned. I cannot see how the omission of these provisions in 1947 had any significance or effect upon the construction to be given that amendment or that it forms any basis for the transposition of the $10,000,000 minimum into a maximum.

But, aside from all other considerations, the most serious objection to the ruling herein is that it has the effect of overriding the will of the people expressed at the last Congressional election. After House Bill 178, which later became Act No. 155 of 1948, had been finally passed by both houses of the Legislature and had been sent to the Governor, but before the Governor had acted upon it, the House of Representatives, on June 23, 1948, amended Senate Bill No. 29 to add thereto a proposal to amend Section 14 of Article XII of the Constitution

by adding a new paragraph (numbered 6) to the Section, reading as follows: "Sixth. Anything contained in this section or any other provision of this constitution *to the contrary notwithstanding, the Legislature may appropriate sufficient moneys out of the State Public School Fund to pay* the salary of State Superintendent of Public Education, the expenses of operating the State Department of Education, the amounts necessary for vocational education and vocational rehabilitation, the amounts necessary to participate in furnishing lunches to the school children of the state, the amounts necessary for the operation of the Teachers' Retirement System including reimbursement to the parish and city schoolboards for their contributions as employers to the teachers' retirement fund, and *the amounts necessary to provide for the payment of minimum salaries, as may be fixed by the Legislature, to teachers in the public common. schools of elementary and secondary grades.* Any provision of paragraph Fifth of this Section, or any other provision of this Constitution, in conflict with the provisions of this paragraph, are, to the extent of such conflict only, repealed. Any such appropriations made by the Legislature prior to

the adoption of this section are ratified and confirmed." (Italics mine).

This amendment became Act No. 512; it was submitted to the electors and defeated at the Congressional election held on November 2, 1948. The majority opinion asserts that this amendment, which squarely placed before the people the question of whether it was desirable to permit distributions out of the State Public School Fund in a manner other than that provided for in Section 14 of Article XII, was in the nature of a precautionary measure "taken by reason of the ambiguity attending the constitutional provisions under consideration." [2] If the correctness of the majority statement be conceded, the view does not provide a satisfactory explanation of the fact that the Legislature asked the people to change the Constitution in order that monies could be diverted from the State Public School Fund in a manner other than that provided for and that the proposal was rejected. This disapproval of the people constituted their own interpretation of the meaning of Section 14 of Article XII and furnishes, in my opinion, a complete answer to any charge that the provision, as it presently stands, is vague and indefinite.

---

[2] This is pure speculation, as there is nothing to show that the Legislature submitted the amendment to the people as a matter of precaution or that it entertained the belief that the constitutional provisions were ambiguous. As long as we are in the realm of conjecture, I think that it would be more reasonable to assume that the Legislature, acting upon competent legal advice, felt the necessity for the amendment in view of the clear provisions of Section 14 of Article XII of the Constitution.

After all, if the Section is to be regarded as obscure, it is the duty of the Court to discover the intention of the people by interpretation and construction.[3] What better guide could be had to that discovery than the answer given by the people on November 2, 1948 to the proposal to amend the Section?

I believe that the judgment of the district court should be affirmed.

---

[3] Article 18 of the Civil Code provides: "The universal and most effectual way of discovering the true meaning of the law, when its expressions are dubious, is by considering the reason and spirit of it, or the cause which induced the Legislature to enact it." See also In re Hibernia Bank & Trust Co., 185 La. 448, 169 So. 464 and cases there cited.